**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CALLIOPE CAPITAL**
**CORPORATION,**

        **Plaintiff,**

**v.**                                          **Case No. 8:08-cv-219-T-17TBM**
**EARTHFIRST TECHNOLOGIES**
**INCORPORATED, et al.,**

        **Defendants.**
_____/

## REPORT AND RECOMMENDATION

        THIS MATTER is before the court on referral by the Honorable Elizabeth A. Kovachevich for a Report and Recommendation on **Plaintiff's Motion to Appoint Receiver, Request for Expedited Discovery** (Doc. 9).[1]  In support of its motion, Plaintiff files the affidavit of Lloyd Davis (Doc. 10), supplements to its motion (Docs. 16, 48, 58), and the deposition of Michael Brooks (Doc. 34).  Defendants have filed a response in opposition (Doc. 18) along with the declarations of John Stanton (Docs. 18-2, 57), Frank Barker and Jaime Jurado (Doc. 38).  Hearings on this matter were conducted on February 22, 2008, March 17, 2008, and April 15, 2008.

---

[1]The motion is against all Defendants *except* Electric Supply of Tampa, Inc., and CNC Associates, Inc.  Since the filing of this action, Hanna Properties Corp. has intervened, (Doc. 51, 55), and is a party to this motion.

I.

On January 31, 2008, Plaintiff filed the instant action for foreclosure of real and personal property and breach of contract.[2]  Shortly thereafter, Plaintiff filed it's instant motion.

By its motion (Doc. 9), Plaintiff seeks an Order appointing a receiver to manage Defendants' business operations and protect Defendants' assets subject to the foreclosure action, including all real and personal property.  Plaintiff argues it is entitled to the appointment of a receiver upon default under the terms of the loan and security agreements Defendants entered into with Laurus.  According to Plaintiff, it is undisputed that Defendants have defaulted under the terms of the security and loan agreements and the appointment of a receiver is necessary to protect its secured interest in Defendants' assets.  It maintains that almost all of Defendants' business operations have ceased as a result of Defendants' improper, unacceptable, and wasteful business practices and all attempts at conciliation have

_____

[2]The salient allegations in the Complaint are as follows.  In or about March 2005, Laurus Master Fund, Ltd., ("Laurus") loaned roughly $8,000,000 to Earthfirst Technologies, Inc., ("EFTI") and its subsidiaries (collectively, on this motion, the "Defendants").  To secure the loan, Defendants executed, among other documents, several notes, security agreements, guarantees, and a mortgage deed.  The master security agreement provides that as collateral, Defendants grant to Laurus a continuing security interest in Defendants' property including real property, cash, accounts, equipment, inventory, accounts receivable, contract rights, intangibles and so on.  On March 13, 2007, Laurus notified Defendants that they were in default under the terms of the notes and security agreements.  Efforts to resolve the default, including a disputed forbearance agreement dated October 2, 2007, failed.  In November 2007, Laurus notified Defendants of default and acceleration.  On October 1, 2007, Laurus transferred to Calliope Capital Corporation ("Calliope") all of Laurus's rights, title, and interest in the loan and security agreements.  Calliope claims there is now due and owing from Defendants in excess of $8,900,000.  It sues for breach of contract, foreclosure of personal property, and foreclosure of real property.  *See* Compl. (Doc. 1).

failed.  Plaintiff urges that an action at law is an inadequate remedy because of the loss of

adequate security, there is a high probability that it will succeed on all claims, Defendants are

mismanaging their assets, the balance of potential harms favors appointing a receiver, and it

has reason to believe that Defendants have transferred assets to non-defendant entities.  (Doc.

9).

In support, Plaintiff proffers the affidavit of Lloyd Davis, the senior managing

director and chief credit officer of Laurus Capital Management, LLC.[3]  (Doc. 10).  In addition

to outlining the financing and security arrangements between Laurus and Defendants, Davis

testifies that since the March 2007 default, efforts have been made to cure the default without

success.  In an effort to assist Defendants with curing the default, Laurus retained Phoenix

Management Services, Inc., ("Phoenix") to investigate and advise it on the condition of

Defendants' operations and the viability of its businesses.  On October 2, 2007, Laurus and

Defendants entered into a multifaceted Amendment and Forbearance Agreement

("forbearance agreement") whereby Defendants acknowledged the default and agreed to a

number of conditions including oversight of Electric Machinery Enterprises, Inc.'s ("EME")

operations by a consultant from Phoenix in exchange for a period of forbearance by Laurus.[4]

*See* (Doc. 1, Ex. O).  Davis maintains that Defendants wholly failed to comply with the terms

---

[3]Laurus Capital Management, LLC, is Calliope's investment manager.

[4]At present, there is a dispute over the enforceability of the forbearance agreement
given that it is dated one day *after* Laurus claims to have transferred all it rights, title and
interest to Calliope.  In my view, it is unnecessary to resolve the enforceability issue on this
motion as Defendants are in clear default under the original notes and security agreements.

of the forbearance agreement and, in particular, refused to cooperate with Michael D. Brooks, the consultant from Phoenix who undertook to oversee the business at EME.[5]

Plaintiff also proffers the deposition of Brooks.[6]  By Plaintiff's account, Defendants failed to cooperate with Brooks.  More significantly, Brooks found evidence of the fraudulent diversion of EME funds away from EME and the other Defendants.  On the basis of this diversion of funds, he opined that the appointment of a receiver was necessary and appropriate to protect the diminishing assets of Defendants.

Defendants respond that Plaintiff is not entitled to the appointment of a receiver based solely on an alleged contractual right to such absent a showing by Plaintiff that the factors considered necessary for such relief are satisfied by competent evidence.  As for Brooks, Defendants contend his testimony more accurately reads that he cannot identify any fraudulent conduct by the Defendants.  Defendants decry the veracity and conclusory nature of Plaintiff's proffer and urge that under the applicable standard, the motion should be denied. (Doc. 18).

In support, Defendants proffer the affidavits of John Stanton, chairman and CEO of EFTI.  By his account, EFTI is a publicly traded holding company and continues in operation as do its subsidiaries.  Stanton concedes that the business of EME, its primary operating subsidiary, has subsided.  Nonetheless, he insists that EFTI and other subsidiaries continue to

---

[5]A more recent declaration from Davis counters some of the Defendants' responsive allegations and outlines the failed efforts at resolving the dispute.

[6]Plaintiff filed designations from Brooks' deposition (Doc. 40) and Defendants filed counter-designations to the same (Doc. 41).

develop and commercialize the alternative fuel and related technologies and Prime Power

Residential, Inc., continues to conduct its residential electric business.  He denies any

mismanagement or waste of assets and insists that all funds are properly accounted for.

Stanton urges that the appointment of a receiver would do great harm to EFTI's ability to

commercialize and market its technology and EME's ability to complete ongoing projects,

thus reducing the value of EME's receivables and the value of EFTI's publicly traded stock.

*See* Decl. Stanton (Doc. 18-2).[7]

Defendants offer the declaration of Frank Barker, CFO of EFTI, in further

corroboration of Stanton's statements and in explanation of the financial operations of

Defendants.  Rather than revealing a wrongful diversion of Defendants' assets, the cash

management plans in place since January 2007 have permitted the operating subsidiaries to

continue to operate.[8]  Barker concedes that the cash management plan at EME was altered

after its account was garnished by Electric Supply of Tampa, Inc., in order to avoid further

collection efforts of its creditors and to assure continued viability of EME and its contribution

to the funding of other activities of the Defendants.  He includes an exhibit which he claims

shows the flow of cash according to the payment scheme.  He also maintains that funds

_____

[7]In his most recent declaration, Stanton counters that Defendants have done all they can to cooperate with the Plaintiff in seeking a favorable solution to the disputes.  (Doc. 57).

[8]The primary operating subsidiaries are defendants EME, WESTCO and Prime Power Residential, Inc.  As an example of its continued operations, the witness cites efforts by WESTCO to enter into business arrangements, transfer some of its "technology" to a third party for further development, and commercialization as a means of assuring the viability and preservation of its technology for the benefit of all the Defendants and Plaintiff.  By his account, Plaintiff and Laurus are aware of and have recently agreed to the development of one such relationship with a company named Renewable Carbon Technologies ("RCT").

5

generated from the sale of surplus equipment under the forbearance agreement have not been misapplied but instead have been used to fund the Defendants' operations.  Certain proceeds from the sale of such equipment have been placed in a segregated account ostensibly because they are subject to a lien of Hanna Properties, Inc..  *See* Decl. Barker (Doc. 38-4).

Defendants also offer the declaration of Jaime Jurado, vice chairman of the board of EFTI, EME's president and president of Hanna Properties, Ltd ("Hanna").[9]  In the interest of the companies' continued operation, Hanna has permitted them to occupy the premises without the payment of rent since July 2006.  Jurado claims that Hanna has a superior and first right over Plaintiff to any and all proceeds from the sale of EME's equipment located at the Hanna address by virtue of its landlord lien.  By his account, on the basis of Hanna's forbearance and advance of monies to Defendants, they have been able to continue to operate as evidenced by WESTCO's negotiated agreement with RCT, which venture is projected to generate $4,000,000 to $6,000,000 in net proceeds to EFTI during the next five years.  Jurado asserts that Plaintiff has sanctioned the venture and stands to gain the benefit of such proceeds which have been assigned to it.  *See* Decl. Jurado (Doc. 38-2).  He includes a copy of the RTC agreement as an exhibit.  (Doc. 38-3).

## II.

A court's power to appoint a receiver in a diversity action is based solely on federal law.  *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289, 1292 (11th Cir. 1998).

---

[9]Hanna leased certain property on Hanna Avenue in Tampa to EME in 1995 on a thirty year lease.

The appointment of a receiver is an extraordinary remedy. *Strickland v. Peters*, 120 F.2d 53 (5th Cir. 1941); *United States v. Ianniello*, 824 F.2d 203, 207 (2d Cir. 1987). Factors courts consider in determining whether to appoint a receiver include (1) whether fraudulent activity has or will occur, (2) the validity of the claim, (3) the danger that property will be lost or diminished in value, (4) inadequacy of legal remedies, (5) the availability of a less severe equitable remedy, and (6) the probability that a receiver may do more harm than good. *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241-42 (5th Cir. 1997) (quoting *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir. 1993)); *Consol. Rail Corp v. Fore River Ry. Co.*, 861 F.2d 322, 326-27 (1st Cir. 1988).

III.

For the reasons set forth hereafter, I recommend that the court appoint a receiver to assume management over the operations of the Defendant companies and control over their assets pending further proceedings in this court. As a starting point, it is incontrovertible that Defendants are in default of the notes and security agreements and presently owe Plaintiff in excess of $8,000,000. Plaintiff demonstrates a substantial likelihood of success on the merits of its claims. The notes, security agreements, mortgage and other related documents permit the Plaintiff to take immediate possession of the collateral, whether real or personal property, upon default and the right to seek appointment of a receiver with authority to assume control over the same. Plaintiff's claim for damages for breach of contract is an insufficient remedy in light of the current level of operations of Defendants' businesses, the sale or other transfer of the assets, and the ongoing use of the dwindling receivables to fund current activities. In

7

the present operating circumstances, Plaintiff's security has been and will be diminished through the continued operation of the businesses.[10]  Discovery to date clearly indicates that Defendants' creative payment scheme is operating in a manner intended to avoid its creditors, including Plaintiff.[11]  While Plaintiff's allegations of fraud are not clearly established, such is not required.  The present scheme for handling receivables does divert collateral in a way that prevents Plaintiff from reaching it.  The parties' own efforts at arriving at lesser remedial measures to assure the *status quo* pending further proceedings in foreclosure have failed and none are proposed on this motion.

Finally, because it appears that Plaintiff is substantially likely to prevail on its foreclosure claims as against these Defendants, a balancing of the harms that will result from the imposition of a receiver, while problematic, nonetheless favors Plaintiff.  There is likely substantial harm to the Defendants should a receiver be ordered to take over the

---

[10]For example, EME was once the primary operating subsidiary of EFTI but has been rendered effectively defunct apart from its efforts to collect receivables for work previously performed.  The continued use of EME receivables to fund the whole of Defendants' activities continues to deplete Plaintiff's collateral.  Similarly, the sale of surplus equipment as called for under the forbearance agreement and use thereafter of such funds to support the activities of the Defendants also depletes such collateral.  Whatever income is still being generated by Prime Power Residential is not demonstrated to be sufficient so as to warrant a different conclusion.

[11] The deposition of Brooks speaks to the lack of full cooperation by Defendants under the forbearance agreement, regardless of its enforceability.  Once in place, Brooks discovered that EME was effectively out of business apart from attempting to collect on monies due and that monies generated by the company were being diverted to other accounts for the purpose of avoiding creditors.  This scheme is conceded by Defendants who insist that it is necessary to allow for the ongoing work of the companies.  However, the scheme diverts EME receivables to Stanton and/or others in a manner allowing for his complete control over such funds, thus depriving Plaintiff of access to this security as well.

8

assets/collateral and operations of the businesses.  The imposition of a receiver will likely result in the wind-up of these businesses.  Plaintiff is a hedge fund and is wholly disinterested in further funding the continued operations of these businesses or allowing its dwindling collateral to be used for such purposes.  Thus, the imposition of a receiver to marshal the assets and operate the companies will likely spell the death knell to these entities. Shareholders and other investors in EFTI will suffer a loss, and the few remaining employees will likely lose their jobs.  Efforts at developing commercially viable technology may well be laid to waste.  However, these are the likely consequences of Plaintiff prevailing on its foreclosure claims and consequences for which Defendants bargained in negotiating the loans. While it may work these harsh results, Defendants offer no other financial plan in avoidance other than the continued depletion of Plaintiff's security as a means of avoiding this end.  In the circumstances, Plaintiff should be afforded the benefit of its bargain to avoid further harm to its financial position.

In sum, given Defendants' default on the notes, mortgage and under the security agreement, the current level of business operations and the manner by which it is being funded, and the diminution of Plaintiff's security, Plaintiff is entitled to the relief sought.  A receiver will bring no greater or additional harm to the Defendants' operations than will the inevitable foreclosures.  Ostensibly, if aspects of Defendants' operations are salvageable, the receiver will work to salvage the same for the parties' economic benefit.  On the other hand, if the businesses are beyond repair, the appointment of a receiver will serve the salutary purpose of marshaling the remaining assets in a manner which will allow for the orderly disposition of the same in a manner most equitable to all parties.

IV.

For the foregoing reasons, it is recommended that the court GRANT **Plaintiff's Motion to Appoint Receiver, Request for Expedited Discovery** (Doc. 9).  Within <u>ten (10) days</u> from the date of this Report and Recommendation, Plaintiff shall propose the name of a qualified receiver and the exact scope of his or her appointment for consideration by the district judge.

Respectfully submitted on this
18th day of April 2008.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.


Copies to:
United States District Judge
Counsel of Record